IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| STATE OF ALABAMA and the ALABAMA STATE DOCKS DEPARTMENT, n/k/a THE ALABAMA STATE PORT AUTHORITY, | * * | |
| Plaintiffs, | * | CIVIL ACTION NO. 85-0642-CG-C |
| v. | * | |
| ALABAMA WOOD TREATING CORPORATION, et al., | * | |
| Defendants. | * | |

_____

PLAINTIFFS' REPLY TO DEFENDANT ILLINOIS CENTRAL'S BRIEF
IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

_____

WALTER M. COOK, JR.
WILLIAM E. SHREVE, JR.
SHERRI R. GINGER
PHELPS DUNBAR LLP
2 North Royal Street (36602)
Mobile, Alabama  36652
251/432-4481

ATTORNEYS FOR PLAINTIFFS

TABLE OF CONTENTS

I.   RESPONSE TO ILLINOIS CENTRAL'S "INTRODUCTION" AND "GENERAL FACTUAL BACKGROUND." ................................................................................ 1

II.  THE STATE IS ENTITLED TO SUMMARY JUDGMENT ON LIABILITY. ............... 3

     A.   Illinois Central is liable for contamination of the wood-treating site. ...................... 3

     B.   Illinois Central is liable for contamination of formerly submerged land where creosote surfaced during the container-terminal construction. ............................ 4

     C.   The State's alleged responsibility for contribution does not affect Illinois Central's liability under CERCLA. ................................................................................ 5

III. THE STATE IS ENTITLED TO SUMMARY JUDGMENT FOR ITS RESPONSE COSTS. ........................................................................................................ 5

     A.   The State's response costs are not inconsistent with the NCP. ............................... 5

     B.   The State is entitled to recover its engineering costs. .............................................. 6

     C.   The State is entitled to recover its attorney's fees. ................................................... 9

     D.   The State is entitled to recover employee overhead. .............................................. 11

     E.   The State is entitled to recover prejudgment interest. ............................................ 11

     F.   The State is entitled to recover costs of the sheet-pile wall and fill. ...................... 13

IV.  THE STATE DID NOT SPOLIATE EVIDENCE OR VIOLATE DISCOVERY REQUIREMENTS ............................................................................................. 14

V.   EXPERT REPORTS THE STATE CITED ARE COMPETENT EVIDENCE. ............... 15

CERTIFICATE OF SERVICE ............................................................................................... 17

I.      RESPONSE TO ILLINOIS CENTRAL'S "INTRODUCTION" AND "GENERAL FACTUAL BACKGROUND."

CERCLA § 9607(a)(4)(A) states that responsible parties are liable for "all costs of removal or remedial action incurred by the United States Government, <u>a State</u>, or an Indian tribe not inconsistent with the [NCP]." 42 U.S.C. § 9607(a)(4)(A) (emphasis added). Illinois Central questions whether Plaintiffs are to be "treated as the 'State'" and whether "the [Port Authority] was in fact acting as the 'state' and/or using 'state' land in remediating the [wood-treating] site and/or in constructing the [container terminal]" (doc. 481 at 2 & n.2).

The Plaintiffs <u>are</u> a "State." CERCLA § 9601(27) defines "State" in part as "the several States of the United States," which includes Alabama. A "State" also includes state agencies. See <u>Washington State Dep't of Transp. v. Washington Natural Gas Co.</u>, 59 F.3d 793, 800-01 (9th Cir. 1995) (department of transportation, as state agency, was a "State" under § 9607(a)(4)(A)). "[T]he Alabama State Port Authority...is an agency of the State of Alabama." <u>Alabama State Docks Terminal Ry. v. Lyles</u>, 797 So. 2d 432, 434 (Ala. 2001). It has sovereign immunity under the constitutional provision "[t]hat the State of Alabama shall never be made a defendant in any court." See <u>Lyons v. River Road Constr. Co.</u>, 858 So. 2d 257, 261 (Ala. 2003) (citing Ala. Const. art. I, § 14). Because the Plaintiffs <u>are</u> the State, they cannot be treated or act otherwise.

Illinois Central says there is no evidence it "was ever a customer of" Reilly (doc. 481 at 3). Illinois Central's 30(b)(6) representative testified Reilly did "some treating for the railroad, they did treat various timbers that the railroad used" (Strong dep. at 20-21, 25). A former Reilly employee testified Reilly sold product to Illinois Central's predecessor, GM & O Railroad (which merged with Illinois Central and whose liability it has assumed) (Cocke dep. at 6-10, 66; Ill. Cent. ans. [doc. 300] at 6 [¶ 9]; Strong dep. at 27-28). In addition, Illinois Central profited from leasing the site along with a pier and slip to Reilly (see, e.g., doc. 323-7, 323-11), and from

1

shipping Reilly's product (see doc. 323-4 [1917 lease] at 2, stating Reilly "agrees to give to said Railroad Company the transportation of the entire product of the raw material originating at this station, or an equal amount of tonnage"; id. at 4).

Illinois Central states that "[a]n ASD representative has testified that, at th[e] time [the JTC dissolved in 1997], remediation efforts were '99% completed,'" citing Martin Brinkman's 2008 deposition testimony (doc. 481 at 4 & n.12). Brinkman did not testify as an "ASD representative"; he retired many years ago (Brinkman dep. at 8, 40-41). As the State explained in a previous brief, Brinkman was testifying about the status of work as of the time he left the State's employment, and his estimate was inaccurate, as the State had not completed anywhere near 99% of the remediation (see doc. 479 at 3-4).

Illinois Central also claims the State "covered the entire area of the super port with twelve feet of soil to raise the level of the land for insurance purposes and to protect cargo unloaded at the facility" (doc. 481 at 4). As ADEM requires that hazardous-waste facilities "located in a 100-year floodplain must be designed, constructed, operated, and maintained to prevent washout of any hazardous waste by a 100-year flood." Ala. Admin. Code § 335-14-5-.02(9)(b). The State's Corrective Measures Study recommended a soil cover and stated that "[s]ufficient soil cover would be provided to elevate final grade above flood plain elevation....This elevation would provide protection to the cover during flooding conditions." (Cobb dep. vol. I, Def.'s Ex. 18 at 6-10). The Corrective Measures Implementation Workplan that ADEM approved and which the State's permit required it to perform stated "[t]he soil cover will be installed to a minimum elevation of 12 feet, the 100-year flood plain elevation" (id., Def.'s Ex. 19 at 1-35, 2-3; doc. 229-1 at 40, 46; Wright aff. [doc. 230-1] at 2). Thus, the cover installed to this height on the wood-treating site was part of the remedy.

II.     THE STATE IS ENTITLED TO SUMMARY JUDGMENT ON LIABILITY.

The State will first address Illinois Central's liability for contamination of the 14-acre wood-treating site, then for contamination of the formerly submerged land where creosote surfaced during the container-terminal construction.

A.      **Illinois Central is liable for contamination of the wood-treating site.**

The elements of liability under CERCLA § 9607(a)(4)(A) are (1) "the site in question is a 'facility,'" (2) "a release or threatened release of a hazardous substance…occurred," (3) "the release or threatened release…caused the plaintiff to incur response costs," and (4) "the defendant is a responsible party under [§ 9607 (a)] of CERCLA." United States v. Mountain Metal Co., 137 F. Supp. 2d 1267, 1273 (N.D. Ala. 2001) (internal quotation marks omitted).

Illinois Central does not dispute that the wood-treating site is a "facility," that a "release" occurred, or that, as a former owner who leased the site to companies who disposed of hazardous substances, it is a responsible party. It only argues the State has "failed to establish that the $27 million in 'response costs' [the State] seek[s] were in fact all 'response' costs under CERCLA" (doc. 481 at 6) (emphasis added).

Under § 9607(a), "liability attaches if a release...'causes' incurrence of some response costs; it does not require that such a release cause all of the response costs which the [plaintiff] seeks to recover." Town of Wallkill v. Tesa Tape, Inc., 891 F. Supp. 955, 960 (S.D.N.Y. 1995) (emphasis in original). The State has proved that it incurred "some" response costs (Harris dep. vol. I at 21; Downs aff. [doc. 474, attachmt. 3] at 1-2 & Ex. A). Therefore, Illinois Central is liable under § 9607(a) for contamination of the wood-treating site.

3

**B.    Illinois Central is liable for contamination of formerly submerged land where creosote surfaced during the container-terminal construction.**

The formerly submerged area where creosote surfaced is a "facility." See 42 U.S.C. § 9601(9) ("facility" includes any area where hazardous substance has "come to be located"). The presence of the creosote demonstrates that a "release" occurred. See 42 U.S.C. § 9601(22); United States v. Hardage, 761 F. Supp. 1501, 1510 (W.D. Okl. 1990). The release caused the State to incur response costs (2d Harris aff. [doc. 475, attachmt. 1] at 1; doc. 476, attachmts. 3-6). See 42 U.S.C. § 9601(23)-(25). Illinois Central is a responsible party because it owned the wood-treating site and the pier that Reilly used, and because Reilly (and AWTC after Reilly) disposed of creosote and contaminated wastewater during Illinois Central's ownership. See 42 U.S.C. § 9607(a)(2); Canadyne-Ga. Corp. v. Bank of Am., 174 F. Supp. 2d 1337, 1350-51 (M.D. Ga. 2001). Reilly's expert testified the contamination of the formerly submerged area was "related to activities that occurred at the [wood-treating] site," specifically either unloading operations at the pier or "discharges of wastewater and creosote" into a ditch that ran into the river (Powell dep. at 127-29). Hence, the State has established all elements of Illinois Central's liability for this contamination

Illinois Central states that "Plaintiffs allege that [the] material [that surfaced] was creosote" (doc. 481 at 8) (emphasis added). The State notified the Defendants of this release, and the Defendants' attorneys and representatives inspected the contaminated area (2006 corresp. re inspection). They did not request samples for testing or question that the material was creosote. The Port Authority's environmental personnel and a contractor working on the site identified the material as creosote, the material was tested, and the State's environmental-chemistry expert has opined the material was creosote (Harris dep. vol. I at 42-44 & Def.'s Ex. 7; Wright aff. [doc. 230-1] at 3; Hampton dep. at 94, 116; Embsbo-Mattingly aff., Ex. A at 9, Ex. B

4

at ¶ 3.1.3, 3.2.2, 3.2.4).

Illinois Central further argues it is not liable because it did not own the submerged land (doc. 481 at 15-16). It cites no supporting authority. Nothing in CERCLA states that, where an owner's lessee pollutes the owner's property as well as adjacent property, the owner is only liable for the cost of cleaning up his own land. Moreover, Illinois Central had riparian rights in the river that allowed it to maintain the pier it leased to Reilly "for the purpose of discharging and loading out in tank steamers, and/or barges, creosote oil, road tar, and coal tar" (see, e.g., doc. 323-7 at 1). See Ala. Code § 33-7-50. Though it did not own the submerged lands, Illinois Central is liable because it owned the wood-treating site and pier where its lessees committed the disposals resulting in contamination of those lands.

**C.    The State's alleged responsibility for contribution does not affect Illinois Central's <u>liability</u> under CERCLA.**

Illinois Central argues the State is also a potentially responsible party liable for contribution, and that the State's response costs are subject to apportionment (doc. 481 at 19-21). It has not cited evidence or authorities showing the State is responsible or has such liability. Regardless, "any defense that seeks to mitigate damages paid, reduce contribution, or prevent the full recovery of response costs is, in fact, a defense to cost recoverability, <u>not liability</u>." United States v. Kramer, 913 F. Supp. 848, 853 (D.N.J. 1995) (emphasis added). Thus, even if Illinois Central is correct, it is still a responsible party, liable under CERCLA.

**III.   THE STATE IS ENTITLED TO SUMMARY JUDGMENT FOR ITS RESPONSE COSTS.**

**A.    The State's response costs are not inconsistent with the NCP.**

The State adopts and incorporates its previous brief (doc. 479) on this issue.

5

**B.     The State is entitled to recover its engineering costs.**

Illinois Central argues the "Plaintiffs acknowledge that they have failed to retain the invoices from [ERM Southeast, BCM Engineering, and MACTEC]" and that Plaintiffs "are unable to state whether [these firms'] charges are associated with remediation activities at the [wood-treating] plant, whether they pertain to other nearby facilities, whether they are for services covered by the releases granted in connection with the JTC, or if they are reasonable or not" (doc. 481 at 25). The testimony Illinois Central cites (id. at 25 n.101) does not "acknowledge" any of this and provides no support for its argument.

The State has retained, produced, and filed ERM and BCM invoices with the Court (cost-documentation disk filed 7/8/2010 at ASD-COSTS-0025-56, 0167-76, 0303-11).[1] The State's original counsel hired ERM as an expert consultant, and an ERM employee later served as the State's representative on the Joint Technical Committee (Downs aff. [doc. 474, attachmt. 3] at 1-2). A BCM employee later took over as the State's JTC representative (id. at 2). While the State does not have all of ERM or BCM's invoices, it has a record of what it paid for their work on the wood-treating site, because it booked these expenses to an account (9045) set up in 1986 to track the costs necessitated by the site contamination (id. at 1-2). The State's summary of account 9045 shows the amounts it paid ERM and BCM each year for such work (id. at 2 & Ex. A).

The State has also retained, produced, and filed nearly 3000 pages of invoices and other

---

[1] The State's original counsel, C. Robert Gottlieb, hired ERM as an expert consultant (Downs aff. at 1). The State has not named anyone from ERM as an expert to testify at trial. The State produced and has filed the first page or pages of ERM's invoices, summarizing the charges and showing the total billed. The State did not produce and has not filed ERM's backup documentation that was apparently sent with the invoices, which includes more specific descriptions of ERM's work and expenses, because this would or might reveal facts known or opinions held by ERM, documents prepared in anticipation of litigation or in preparation for trial, or the mental impressions, conclusions, opinions, or legal theories of the State's counsel or representatives. See Fed. R. Civ. P. 26(b)(3)(A), -(b)(3)(B), -(b)(4)(B); cf. Montgomery County v. MicroVote Corp., 175 F.3d 296, 303-04 (3d Cir. 1999).

cost documentation from MACTEC or its predecessor companies (including Environmental Science & Engineering, Harding ESE, and QST) (hereafter collectively "MACTEC") (cost-documentation disk filed 7/8/2010 at ASD-COSTS-0329-535, 0574-1200, 1329-1332, 1466-1469, 1494-1570, 1754-1851, 1855-1944, 2170-2446, 2882-3658, 4225-4468, 5410-15, 6483-6505, 6839-47, 6984-7491). MACTEC, among other things, performed a RCRA Facility Assessment and Corrective Measures Study and designed and engineered the corrective measures on the wood-treating site (docs. prod. by ADEM at ADEM013891, 13901, 13909; Cobb dep. vol. I at 95-96, 106-07 & Def.'s Exs. 18, 19). The State charged MACTEC's costs to account 9045 or to another internal account (AFE 9153) set up for the corrective-measures implementation, which were then transferred to account 9045 (Downs aff. [doc. 474, attachmt. 3] at 2; Dranka dep. at 36-38, 48-49, 131-32). The State's summary of account 9045 shows the amounts the State paid MACTEC each year for its work on the wood-treating site (Downs aff. [doc. 474, attachmt. 3] at 2 & Ex. A).

None of the amounts the State paid ERM, BCM, or MACTEC were released by the "Rolling Mutual Release," in which the parties released claims for amounts they "contributed to the Joint Technical Committee" for work that was or would be "paid for by the [JTC]" out of such contributions (doc. 481-5 at 2-4). The State, Illinois Central, and Reilly each contributed $2.3 million to the JTC (a total of $6.9 million) (doc. 134 at 4). The State's summary of account 9045 contains a distinct column for its JTC contributions, totaling $2.3 million, and the State is not claiming this amount because of the release (Downs aff. [doc. 474, attachmt. 3] at 2-3 & Exs. A & B). The State booked its payments to ERM, BCM, and MACTEC separately in account 9045, which means the State, not the JTC, paid these costs (id., Ex. A). The JTC had no reason to pay ERM for serving as an expert consultant to the State's counsel or as the State's JTC

7

representative, or BCM for its services as such representative. Also, the JTC dissolved in 1997, and MACTEC performed nearly all its work after that (Downs aff. [doc. 474, attachmt. 3] at 2 & Ex. A; docs. prod. by ADEM at ADEM013891, 13901, 13903, 13909; Cobb dep. vol. I at 95-96, 106-07 & Def.'s Exs. 18, 19). Consequently, the JTC <u>could not</u> have paid MACTEC for its services, and MACTEC <u>could not</u> have performed "services covered by" the release.

Whether ERM, BCM, or MACTEC's charges were "reasonable" is irrelevant. CERCLA "imposes no obligation on the United States [or a State] to minimize its response costs for the benefit of responsible parties who are liable for the costs." <u>United States v. American Cyanamid Co.</u>, 786 F. Supp. 152, 161 (D.R.I. 1992). Section 9607(a)(4)(A) "does not limit the government's recovery to 'all <u>reasonable</u> costs'; rather, it permits the government to recover '<u>all</u> costs of removal or remedial action incurred...not inconsistent with the [NCP].'" <u>United States v. Hardage</u>, 982 F.2d 1436, 1443 (10th Cir. 1992) (emphasis in original). See also <u>United States v. Northeastern Pharm. & Chem. Co.</u>, 810 F.2d 726, 748 (8th Cir. 1986) (§ 9607(a)(4)(A) "does not refer to 'all <u>reasonable</u> costs' but simply to 'all costs'") (emphasis in original); <u>United States v. E.I. du Pont de Nemours & Co.</u>, 341 F. Supp. 2d 215, 242 (W.D.N.Y. 2004) ("[T]he [U.S.] Government may recover '<u>all</u> costs of removal and remedial action....'...As many other courts have recognized, '[n]o factor of reasonableness or necessity of individual remedial costs is explicitly or implicitly required.'") (emphasis in original).

As for the NCP, it "regulates <u>choice of response actions</u>, not costs," <u>Hardage</u>, 982 F.2d at 1443 (emphasis in original), and it does "not require response cost items to be 'reasonable.'" <u>United States v. Akzo Nobel Coatings, Inc.</u>, 990 F. Supp. 892, 895 (E.D. Mich. 1998). See also <u>Hardage</u>, 982 F.2d at 1443 ("a challenge that an individual cost is excessive or unreasonable does not demonstrate inconsistency with" NCP). "As long as the government's choice of

8

response action is not inconsistent with the NCP, its costs are presumed to be reasonable and therefore recoverable." Hardage, 982 F.2d at 1443. See also Northeastern Pharm. & Chem. Co., 810 F.2d at 748 (government's costs not inconsistent with NCP "are conclusively presumed to be reasonable"). Therefore, "[r]easonableness of costs for clean-up is not a defense to recovery." American Cyanamid Co., 786 F. Supp. at 161-62 (emphasis added). See also United States v. Kramer, 757 F. Supp. 397, 436 (D.N.J. 1991) ("[T]erms used by defendants in their affirmative defenses such as 'proper' or 'improper,'…and 'unreasonable, duplicative and not cost-effective,' do not state an appropriate challenge to the propriety of the government's response costs, and will be stricken.").

C.  **The State is entitled to recover its attorney's fees.**

Illinois Central argues the definitions of "removal" and "remedial" action do not include "litigation related or enforcement activities," that CERCLA does not evince any intent to allow the government or a state to recover attorney's fees, and that "[l]itigation related attorneys' fees are thus not recoverable," citing KeyTronic Corp. v. United States, 511 U.S. 809 (1994) (doc. 481 at 26-28). Illinois Central is wrong on all counts.

"[T]he terms 'removal' and 'remedial action'…include enforcement activities related thereto." 42 U.S.C. § 9601(25) (emphasis added). As a result, CERCLA § 9607(a)(4)(A) "evinces an intent to provide for attorney fees because it allows the government to recover 'all costs of removal or remedial action' including 'enforcement activities.'" United States v. Chapman, 146 F.3d 1166, 1175 (9th Cir. 1998). Hence, the government or a state can recover attorney's fees incurred in cost-recovery litigation. See id. at 1173-76; United States v. Dico, Inc., 266 F.3d 864, 876, 878 (8th Cir. 2001) (affirming award of government's "attorney fees and litigation costs," stating that "attorney's fees are recoverable as response costs under

9

CERCLA"); E.I. du Pont de Nemours & Co., 341 F. Supp. 2d at 241 (government's "enforcement costs incurred in connection with [cost-recovery] litigation are recoverable").

KeyTronic, 511 U.S. 809, is not to the contrary.  It held that CERCLA § 9607(a)(4)(***B***) "does not provide for the award of attorney fees to a private party bringing a cost recovery action." Chapman, 146 F.3d at 1173 (emphasis in original).  The KeyTronic court "expressly declined…to determine whether attorney fees are recoverable by the government, stating 'we offer no comment' on whether 'enforcement activities' entitles the government to recover its attorney fees under [§ 9607(a)(4)(A)]." Chapman, 146 F.3d at 1174 (emphasis added).

Illinois Central also argues the State cannot recover attorney's fees based on redacted invoices, because the invoices do not permit assessment of whether the fees are reasonable (doc. 481 at 28-29).  The State does not have to prove the fees are reasonable in order to recover them. "CERCLA does not refer to 'all reasonable costs' but simply to 'all costs.'" Northeastern Pharm. & Chem. Co., 810 F.2d at 747-48.  Accordingly, a State's claim for attorney's fees "is not subject to a 'necessary' or 'reasonableness' standard," and a defendant "cannot avoid liability for...enforcement costs by arguing that those costs were unnecessary or unreasonable." E.I. du Pont de Nemours & Co., 341 F. Supp. 2d at 242-43.  See also United States v. Domenic Lombardi Realty, Inc., 334 F. Supp. 2d 105, 106-08 (D.R.I. 2004) (holding that government's attorney's fees were not "subject to a reasonableness determination," and awarding fees even though government "never provided an itemized list of attorney's fees" and even though it "overstaffed the case, using it as a training vehicle for several junior lawyers").

Since the State is entitled to recover all of its fees, and since the fees are not subject to any reasonableness determination, redaction of the State's invoices makes no difference.  If the Court for some reason finds otherwise, it can bifurcate or separately try the fee issue and permit

10

the State to produce unredacted or partially redacted invoices after deciding the rest of the case. See Fed. R. Civ. P. 42(b); In re Estate of Ransburg, 608 So. 2d 49, 51 (Fla. Dist. Ct. App. 1992). The State's invoices – which include the undersigned firm's past and ongoing monthly bills – contain itemized and specific descriptions of its attorneys' services. These include descriptions of attorney-client communications and work product, and reflect the "mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." See Fed. R. Civ. P. 26(b)(3)(B). As such, they are privileged. See, e.g., Montgomery County v. MicroVote Corp., 175 F.3d 296, 303-04 (3d Cir. 1999). Production of unredacted invoices would reveal information concerning the State's trial preparation and strategy, unfairly prejudicing the State. Illinois Central has tacitly recognized this – though it now argues the State's claiming attorney's fees waived any privilege as to the invoices, during Phase I (paper) discovery, it did not ask for or move to compel the State to produce unredacted invoices.

**D.   The State is entitled to recover employee overhead.**

Overhead is recoverable in a cost-recovery action. See United States v. R.W. Meyer, Inc., 889 F.2d 1497, 1503-04 (6th Cir. 1989). The State's accountants have reasonably estimated the overhead the State incurred for the time two of its employees, Bob Harris and Cliff Wright, spent working on remediation of the wood-treating site (Turner dep. at 28 & Def.'s Ex. 6 at 5).

**E.   The State is entitled to recover prejudgment interest.**

CERCLA § 9607(a) states that prejudgment interest "shall accrue from the later of (i) the date payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned." The State's complaint filed in May 1985 demanded payment of response costs

"which presently exceed[] $10,000.00" (doc. 1 at 11), satisfying the written-demand requirement. See Bancamerica Comm'l Corp. v. Mosher Steel of Kan., Inc., 100 F.3d 792, 801 (10th Cir. 1996) (complaint demanding "in excess of $1 million" in response costs constituted written demand); Vine Street, LLC v. Keeling, 460 F. Supp. 2d 728, 768 (E.D. Tex. 2006) ("A complaint constitutes sufficient written demand for payment, notwithstanding whether it specifies an exact amount."). The State incurred virtually all of its response costs after this demand, so interest under § 9607(a) accrues "from the date of the expenditure concerned."

Illinois Central argues the State's accountants "arbitrarily chose an interest rate" to calculate interest (doc. 481 at 29). The accountants used the rate specified in § 9607(a) – the Superfund rate (Turner dep. at 28 & Def.'s Ex. 6 at 5). Illinois Central also argues the accountants "assumed that costs were paid in the year accrued," but fails to explain how or why this is supposedly improper. It further argues the accountants "compounded interest bi-annually." The accountants can easily recompute the interest compounded annually, which courts have held is the correct method of compounding. See Vine Street, 460 F. Supp. 2d at 768.

The State is entitled to prejudgment interest regardless of whether its accountants' computation is correct. An award of interest is "mandatory." United States v. Township of Brighton, 153 F.3d 307, 321 (6th Cir. 1998). See 42 U.S.C. § 9607(a) (cost-recovery award "shall include interest on the amounts recoverable") (emphasis added). The plaintiff can recover interest even where it furnishes no calculation. See Bancamerica, 100 F.3d at 802 ("[T]he district court's refusal to grant [plaintiffs] prejudgment interest because they had not provided the court with interest rates or a method with which to compute the appropriate interest was an abuse of its discretion. Such a requirement is stated nowhere in the statute."); Brighton, 153 F.3d at 321. In such cases, the court computes the interest. See id.; Vine Street, 460 F. Supp. 2d at 168

& n.149.  Also, "because interest determinations are compounded calculations, it may be impossible for parties to provide accurate calculations prior to the court's allocation of response cost liability.  In such instances, parties may submit their interest calculations to the court subsequent to that finding."  Bancamerica, 100 F.3d at 802.

**F.    The State is entitled to recover costs of the sheet-pile wall and fill.**

Illinois Central states the "sheet pile [wall] and [fill] were not intended to contain or prevent migration of any contaminated material" (doc. 481 at 7).  Regardless, they perform this function and therefore constitute a permanent remedial measure (Rouhani dep. at 10, 142 & Def.'s Ex. 6 at 32-33; Harris dep. vol. II at 29-31, 33-34, 39-40, 43-46; Hansen 12/2009 dep. at 20-21, 26-27, 45-46).  The cases Illinois Central cites involving private-party plaintiffs (doc. 481 at 6-8 & n.21, 22, 24, 29, 32) are inapt, and by negative implication, actually strengthen the State's case for recovery of the costs of the wall and fill.

Parties other than the federal government, a State, or an Indian tribe can only recover "necessary costs of response."  42 U.S.C. § 9607(a)(4)(B) (emphasis added).  To prove that costs were "necessary," the plaintiff must show "(1) that the costs were incurred in response to a threat to human health or the environment that existed prior to the initiation of the response action and (2) that the costs were necessary to address the threat."  Southfund Partners III v. Sears, Roebuck & Co., 57 F. Supp. 2d 1369, 1378 (N.D. Ga. 1999) (internal quotation marks omitted).  The Seventh Circuit has stated, "The statutory limitation to 'necessary' costs...is important.  Without it there would be no check on the temptation to improve one's property and charge the expense of improvement to someone else."  G.J. Leasing Co. v. Union Elec. Co., 54 F.3d 379, 386 (7th Cir. 1995).  In cases that Illinois Central cites, courts held private parties could not recover certain response costs because the costs were not "necessary."  See Southfund Partners III, 57 F.

Supp. 2d at 1378-80; Regional Airport Auth. v. LFG, LLC, 460 F.3d 697, 703-06 (6th Cir. 2006); Dunn v. Savage, 2009 WL 278016, *1-2 (E.D. Mich. Aug. 27, 2009).

In contrast, the government or a state can recover "all costs of removal or remedial action." 42 U.S.C. § 9607(a)(4)(A) (emphasis added). Congress intentionally omitted "necessary" from this provision. See Russello v. United States, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section..., it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."). Hence, "Congress deliberately chose not to limit cost recovery by the United States [or a State] to…'necessary costs.'" United States v. Kramer, 913 F. Supp. 848, 856 (D.N.J. 1995) (emphasis added). See also E.I. du Pont de Nemours & Co., 341 F. Supp. 2d at 242 (government's claim was "not subject to a 'necessary'...standard").

Since Illinois Central's cases hinge on the requirement that costs be "necessary," it can be inferred the courts would have decided these cases differently had the plaintiffs been the government or a state suing under § 9607(a)(4)(A), because these plaintiffs would not have had to prove their costs were necessary.

IV.  THE STATE DID NOT SPOLIATE EVIDENCE OR VIOLATE DISCOVERY REQUIREMENTS.

The Port Authority stored thousands of documents, including but not limited to documents concerning the wood-treating site, in the basement of a building located about a quarter-mile west of the Mobile River (3d Harris aff.). Unfortunately, this basement flooded during Hurricane Katrina, ruining these documents (id.). As this Court knows, the flooding caused by this hurricane was severe and unexpected. The floodwaters "were recorded at 11 feet at Mobile, matching the worst previous flood level set in 1917, according to the National

14

Weather Service." <u>Katrina Floods Downtown Mobile, Beaches, Bayous</u>, USA Today, Aug. 25, 2005 (available at http://www.usatoday.com/weather/stormcenter/2005-08-29-katrina-floods-mobile_x.htm).  Undersigned counsel's law firm also flooded during the hurricane.

There is no justification for any sanction under these circumstances, nor any need for one. The State possesses and has produced more than 100,000 pages of documents concerning the wood-treating site.  The Defendants have also obtained thousands of documents from EPA, ADEM, and other third parties.  The site remediation is more than adequately documented.

Illinois Central says that in 1985, it served an interrogatory asking the State to itemize its response costs, and that the State "had a continuing duty to supplement [its answer] for over twenty years" (doc. 481 at 22).  The Court in 1986 ordered, "All proceedings in this action are stayed" (doc. 144 at 9).  "All proceedings" includes discovery.  <u>See</u> <u>Dolenz v. Boundy</u>, 2009 WL 4283106, *4 (Tex. Ct. App. Dec. 2, 2009) ("Because the litigation was stayed, [defendant] had no obligation to respond to the discovery request").  Illinois Central must agree, because it never supplemented its responses to the State's 1985 discovery.[2]

Illinois Central argues that "appropriate sanctions can include exclusion of evidence" (doc. 481 at 23).  The evidence lost in the hurricane has already been effectively excluded.  The documents are gone; the State cannot use them.  It will have to prove its case or not with the evidence that remains.  For this reason also, there is no justification or need for any sanction.

V.    EXPERT REPORTS THE STATE CITED ARE COMPETENT EVIDENCE.

Illinois Central argues the State "cited to improper evidence," i.e., "three different expert

---

[2] Though undocumented, it is undersigned counsel's recollection that sometime after the stay was lifted in December 2004, and possibly at or about the time of the planning conference, the parties agreed they would serve new discovery and would not rely on or expect supplementation of the 1985 discovery.  None of the parties has supplemented its responses to the old discovery, or requested supplementation from other parties.

15

reports – all unsworn" (Ill. Cent. br. at 5).  The State actually cited six expert reports: those of Illinois Central's expert Thompson, Reilly's expert Powell, and the State's experts Rouhani, Turner, Gottlieb, and Hare (doc. 457 at 2-4, 15-16).  Illinois Central fails to identify which it objects to.  Illinois Central itself cites an unsworn report of Reilly's experts Cade and Crenshaw (doc. 481 at 24-25 & n.95, 99, 102), so its argument would also preclude the Court from considering that report.

The Defendants proffered Thompson and Powell as experts and presumably contend their testimony is admissible.  The State, which cannot compel these experts to sign sworn reports, is entitled to use their reports.  Cf. Kerns v. Pro-Foam of S. Ala., Inc., 572 F. Supp. 2d 1303, 1311 (S.D. Ala. 2007) ("[O]nce a party has given testimony through deposition or expert reports, those opinions do not 'belong' to one party or another, but rather are available for all parties to use at trial.").  In addition, Thompson, Powell, Rouhani, and Turner's reports were identified at their depositions and attached as exhibits, making them admissible for summary judgment.  See Medtronic Xomed, Inc. v. Gyrus ENT LLC, 440 F. Supp. 2d 1300, 1310 n.6 (M.D. Fla. 2006) (where unsworn report "was marked as an exhibit and [expert] identified the report" at deposition, report was "properly before [the court] in considering the motions for summary judgment").  Also, the State has now filed Rouhani, Gottlieb, and Hare's affidavits verifying their reports, and expects to file a similar affidavit by Turner (who has been out of his office for several days, unavailable to sign an affidavit).  See Maytag Corp. v. Electrolux Home Prods., Inc., 448 F. Supp. 2d 1034, 1065 (N.D. Iowa 2006) ("[S]ubsequent verification or reaffirmation of an unsworn expert's report, either by affidavit or deposition, allows the court to consider the unsworn expert's report on a motion for summary judgment."); Strauss v. DVC Worldwide, Inc., 484 F. Supp. 2d 620, 633-34 (S.D. Tex. 2007).

                                            */s/William E Shreve, Jr.*
                                            WILLIAM E. SHREVE, JR. (SHREW3946)
                                            WALTER M. COOK, JR.  (COOKW6772)
                                            SHERRI RICH GINGER (GINGS9300)
                                            Attorneys for Plaintiffs

OF COUNSEL:

PHELPS DUNBAR LLP
Post Office Box 2727
Mobile, Alabama   36652

### CERTIFICATE OF SERVICE

     I do hereby certify that I have on this 21st day of July, 2010 served a copy of the foregoing pleading on counsel for all parties to this proceeding by the Court's CM/ECF email system or by mailing the same via the United States mail, first class postage prepaid.

Richard Eldon Davis
L. Ben Morris
Amber M. Whillock
Scott Dickens
Al Vance
STARNES & ATCHISON LLP
100 Brookwood Place, 7th Floor
Birmingham, Alabama 35209

Christian Hines
STARNES & ATCHISON LLP
RSA Tower, Suite 20290
11 North Water Street
Mobile, Alabama 36602

Benjamin R. Slater
Hal C. Welch
Robert W. Dyer
LEMLE & KELLEHER, LLP
Pan American Life Center
601 Poydras Street, Suite 2100
New Orleans, Louisiana   70130-6097

                                              */s/William E. Shreve, Jr.*
                                              WILLIAM E. SHREVE, JR.