UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION

| | | |
|---|---|---|
| STATE OF ALABAMA, ET AL., | * | |
| | * | |
| Plaintiffs, | * | |
| | * | CIVIL ACTION |
| VERSUS | * | |
| | * | NO. 85-0642-CG-C |
| ALABAMA WOOD TREATING CORP., | * | |
| ILLINOIS CENTRAL RAILROAD CO., AND | * | |
| REILLY INDUSTRIES, INC., | * | |
| | * | |
| Defendants. | * | |

**MEMORANDUM IN SUPPORT OF
MOTION TO EXCLUDE EXPERT TESTIMONY**

Defendant Illinois Central Railroad Company (IC) submits this memorandum in support of its motion to exclude the expert testimony of Dr. Shahrokh Rouhani. For the reasons stated below, IC respectfully submits that Dr. Rouhani has insufficient expertise in a number of areas in which he proposes to testify, his testimony is not the product of reliable principles and methodology, and his conclusions are erroneous and inconsistent and therefore would not be helpful to the trier of fact. With regard to at least one of the subjects Dr. Rouhani proposes to address, his testimony is inadmissible as it purports to offer opinions on issues of law which are not appropriate for expert testimony.

Dr. Rouhani has identified his primary area of expertise as environmental statistics;[1] however he testified that "generally speaking in this case I did not really rely heavily on either

---

[1] Deposition of Shahrokh Rouhani, 11/20/09, pg. 11, Ex. 1.

environmental statistics or geostatistics."[2]   He has been qualified as an expert witness in the general broad classes of environmental data analysis."[3, 4]

Despite the fact that he proposes to offer opinion testimony in this case on allocation of costs between PRPS, he has not done so in the past.[5]  Nor has he testified on NCP compliance.[6] When questioned whether he considered himself to be an expert in the regulations regarding NCP compliance, he candidly stated that "he would never claim such a thing,"[7] and when asked if he considered himself to be an expert in the procedures required by a state agency in order to comply with the NCP, his response was "no, I have to rely on other experts' work".[8]

Dr. Rouhani's initial expert report submitted in this case consisted of ninety two pages, while his rebuttal report contained thirty pages of text and attachments consisting of an additional 100 pages. Consistent with Rouhani's answer that he "relies on the work of other experts," nearly all of the text consist of excerpts or paraphrasing of the work of others – be it a report, correspondence, a publication or snippets of testimony of a witness.  His reports, then, are essentially an amalgamation of out of context statements, interpreted or often misinterpreted by Rouhani.

While it may be argued that all of Rouhani's "opinions" or "observations" should be excluded, there are several areas of particular significance that must be addressed.

---

[2] Deposition of Shahrokh Rouhani, 11/20/09, pg. 19, Ex. 1.
[3] Deposition of Shahrokh Rouhani, 11/20/09, pg. 151, Ex. 1.
[4] In several reported decisions, Dr. Rouhani's opinions have been rejected by the court.  In *MSOF Corporation v. Exxon*, 934 So.2d 708 (LA.  App. 1 Cir. 2005), Rouhani offered opinions challenging the expertise, investigative methods, and opinions of two experts proffered by the plaintiff.  The appellate court found that the expert opinion evidence of two experts was admissible despite the testimony of Rouhani.  In *College Park Holdings v. Racetrac Petroleum*, 239 F.Supp.2d 1334 (N.D. Ga. 2002), Rouhani was challenged under *Daubert*.  While the district court denied the *Daubert* challenge in that case, the court was persuaded by CPH's expert, rather than Dr. Rouhani. (at page 1341-42).
[5] Deposition of Shahrokh Rouhani, 11/20/09, pg. 151-152, Ex. 1.
[6] Deposition of Shahrokh Rouhani, 11/20/09, pg. 152, Ex. 1.
[7] Deposition of Shahrokh Rouhani, 11/20/09, pg. 153, Ex. 1.
[8] Deposition of Shahrokh Rouhani, 11/20/09, pg. 153, Ex. 1.

A.    **Dr. Rouhani's Opinions on Allocation Constitute Impermissible Expert Testimony**

Under the Federal Rules of Evidence, expert testimony concerning allocation of costs under CERCLA is impermissible legal testimony.  *See American Special Risk Ins. Co. v. City of Centerline,* 2002 WL 1480821, at *10 (E.D. Mich. June 24, 2002).   It is well established that expert testimony offering legal conclusions invades the province of the trier of fact and is inadmissible.  *See Montgomery v. Aetna Cas. & Surety Co.,* 898 F.2d 1537, 1531 (11th Cir. 1990) ("An expert may not, however, merely tell the jury what result to reach"); *Chick-Fil-A, Inc. v. CFT Develop., LLC,* No. 5:07-cv-501, 2009 WL 1754058, at *3 (M.D. Fla. June 18, 2009).  Dr. Rouhani's opinions concerning how the subject clean-up costs should be allocated are legal conclusions which tell the Court "how to do its job" under CERCLA and should be excluded.  *American Specialty Risk,* 2002 WL 1480821, at *9.

In *American Specialty Risk*, a suit arising under CERCLA, the plaintiffs moved to exclude the testimony of the defendants' allocation expert.  *Id.*  The plaintiffs argued that the defense expert's testimony constituted impermissible legal conclusions, failed to assist the Court with factual issues and told the court how to do its job.  In analyzing the expert's report and testimony, the court noted that the expert "renders allocations under CERCLA using the factors used by district courts in allocation cases."  *Id.*  According to the district court, the defense expert's "purpose was to render an allocation, then, through 'expert testimony,' tell the court how it should render allocation in this case."  *Id.* at *10.  The court rejected the expert holding that the testimony did not aid the court, but rather attempted to persuade the court on how it should allocate costs in the case.  *Id.* The court reasoned that the expert's "testimony and the basis for it is identical to this Court's duty in this bench trial for CERCLA allocation."  *Id.*  Thus, the allocation expert was excluded.

On a substantive level, Dr. Rouhani's proposed testimony is simply erroneous. Dr. Rouhani is neither a chemist[9] nor is he an expert in the operations of the wood treating industry. Thus, it is not surprising that his method of determining allocation based on discharge rates and concentrations of creosote, coal tar distillates and pentachlorophenol over time is unsupportable. In the first instance, Rouhani uses phenol concentrations based on "grab samples" taken on two occasions in eighty years as the sole representative of released contaminants on site. As noted by Dr. Warren Thompson, a recognized expert in waste water discharge and plant operations, phenol concentration in process wastewater is a poor indicator of creosote concentration in the wastewater, since the phenol is in solution and the creosote is not. In addition, phenols are ubiquitous in the environment and therefore not indicative of the presence of creosote or other tar products. Pine bark and wood yield water soluble phenols, both of which are present on site and would be transported through the outfall ditches after rainfall events.[10]

Dr. Rouhani cites other "evidence" to support the assertion that pre-December 1976 releases made up nearly all of the contaminant releases, citing out of context testimony by lay witnesses of creosote smells in the river and creosote sheen on the water. Neither odor nor a sheen is a reliable indicator of a release and an oil sheen in a river would be indistinguishable as to origin, either creosote or petroleum.

Moreover, Dr. Rouhani's allocation formula based solely on his flawed conclusions of discharge to the river fail to address the spectrum of factors the court must weigh in order to allocate response costs. Section 113 (F)(1) provides that "the court may allocate response costs among the liable parties using such equitable factors as the court determines are appropriate."

---

[9] Deposition of Shahrokh Rouhani in the matter entitled *MSOF Corporation, et al. v. Exxon Corporation, et al.*, page 117, attached hereto as Exhibit 4.

[10] Deposition of Warren Thompson, 01/29/10, pgs. 84-86, Ex. 5.

The breadth of a district court's discretion pursuant to § 113(F)(1) has been described as follows:

> By using the term "equitable factors" Congress intended to invoke the tradition of equity under which the court must construct a flexible decree balancing all the equities in the light of the totality of the circumstances.
>
> "The hallmark of a court of equity is its ability to frame its decree to effect a balancing of all the equities and to protect the interest of all affected by it, including the public."  Congress reemphasized that the trial court should invoke its moral as well as its legal sense by providing that the court use not just "equitable factors," which phrase already implies *a large degree of discretion*, but "such equitable factors as the court determines are appropriate."  *This language broadens the trial court's scope of discretion even further*.
>
> *17 Thus, under § 9613(f)(1) the court may consider *any factor it deems in the interest of justice in allocating contribution recovery* … No exhaustive list of criteria need or should be formulated. However, in addition to the criteria listed above, the court may consider the state of mind of the parties, their economic status, any contracts between them bearing on the subject, any traditional equitable defenses as mitigating factors and any other factors deemed appropriate to balance the equities in the totality of the circumstances.

*United States of America v. R.W. Meyer, Inc.,* 932 F.2d 568, 572 (6th Cir.1991)(emphasis added)(footnotes omitted).

Clearly, Dr. Rouhani's reliance on one potential factor-amount of discharge of contaminants over time, even if analyzed properly, which is not the case here, falls far short of the scope of analysis of factors warranting consideration.  For all of these reasons, Dr. Rouhani's proposed testimony on allocation should be excluded.

**B.    Dr. Rouhani Lacks Expertise to Offer Opinions Concerning the National Contingency Plan**

In his expert report and deposition, Dr. Rouhani seeks to offer opinions about the

National Contingency Plan, a subject admittedly well beyond his expertise and training.  In his deposition, Dr. Rouhani conceded that he does not have any expertise or specialized knowledge with regard to the NCP.[11] Given his admitted lack of expertise and training, Dr. Rouhani is not qualified to make inferences or draw conclusions regarding compliance with the NCP.  Thus, his testimony on this subject should be excluded. *Daubert,* 43 F.3d at 1317 (on remand).

### C.    Dr. Rouhani's Opinions Classifying Cleanup as Remedial Action are Impermissible Expert Testimony

Dr. Rouhani seeks to offer testimony regarding the classification of the cleanup of the AWTC site.  However, "[t]he classification of a cleanup is an issue of law, … which is not appropriate for expert testimony." *Yellow Freight System, Inc. v. ACF Industries, Inc.,* 909 F.Supp. 1290, 1299 (E.D. Missouri) citing *Channel Master Satellite Systems, Inc. v. JFD Electronics Corp.,* 748 F.Supp. 373, 386 (E.D. N.C. 1990).  In his initial expert report, Dr. Rouhani opines that the subject cleanup of the AWTC site is a remedial action.[12] In contrast, in their opposition to IC's Motion for Summary Judgment on the NCP, the plaintiffs contend that the AWTC site cleanup is a removal action. *See* Rec. Doc. 479.  Despite the contrast between Dr. Rouhani's report and the plaintiffs' contentions, expert testimony on the classification of a cleanup under CERCLA is inadmissible.

### D.    Dr. Rouhani's Testimony Regarding the Characterization of the Offshore Reclamation as Remediation Should be Excluded Because it is Unreliable and Erroneous

Dr. Rouhani's opinions and conclusions are not based upon valid scientific methodology or reasoning, but rather on the thoughts, opinions and data of others.  In his report, Dr. Rouhani "generally takes a collection of facts, imputes motive and knowledge, and draws unsupported

---

[11] *See* Deposition of Shahrokh Rouhani, page 152, lines 9-11; page 153, lines 5-7 and 14-17, Ex. 1.
[12] *See* Expert Report of Shahrokh Rouhani, page 32, section 4.2.10, Ex 2.

conclusions unrelated to any regulatory expertise." *In re Trasylol Prods. Liab. Litig.,* 2010 WL 1737107, at *17 (S.D. Fla. April 27, 2010). As the Supreme Court has stated, "Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 519, 139 L.Ed.2d 508 (1997).  All of Dr. Rouhani's opinions suffer from a fatal flaw: he simply recounts the history of the AWTC site and all of the companies involved, the contents of internal e-mails and documents, and the findings of scientific studies performed by others; he then "offers a broad opinion, often outside his scope of expertise, that is not connected to the underlying facts in any apparent way and that lacks regulatory expert analysis." *Trasylol,* 2010 WL 1737107, at *17.

In addition, Dr. Rouhani's opinions are often erroneous and inconsistent.  Dr. Rouhani was retained by the plaintiffs in July 2008 and first reviewed the 1989 ERM report some months later.[13]  By that time, the reclaimed area had been filled and covered with concrete; however, according to his testimony, "a big chunk of the area was still exposed."[14]  Despite the opportunity to do so, Rouhani failed to recommend that soil samples be taken to determine the presence of creosote in the reclaimed area.[15]  At that time, according to Rouhani, no consideration had been given to the findings of the 1989 report and the fill and capping and construction of the sheet pile wall had been done without any consideration of these as remediation actions.[16]  It was Rouhani who "based on the 1989 (report), recommended that only this portion which is shown here in blue line to be viewed as the portion warranting

---

[13] Deposition of Shahrokh Rouhani, 11/20/09, pg. 188, Ex. 1.
[14] Deposition of Shahrokh Rouhani, 11/20/09, pg. 188, Ex. 1.
[15] Deposition of Shahrokh Rouhani, 11/20/09, pg. 188, Ex. 1.
[16] Deposition of Shahrokh Rouhani, 11/20/09, pg. 197, Ex. 1.

remediation."[17]   In other words, after the construction work had been done, Rouhani determined

that a portion of the reclaimed area "warranted remediation", so he drew a hypothetical set of

lines and opined that the costs associated with the filling, concrete installation and reclamation of

that area should be claimed as remediation costs.

Early on in his deposition, Rouhani announced that he had recently developed a new and

important opinion which supported his conclusions that the reclaimed area was heavily

contaminated with creosote:

> Before going there, as Walter mentioned, one of the
> interesting features that I discovered after I compiled everything
> was that although presence of contamination in the immediate
> vicinity of the shoreline was not a surprise, it was – there appeared
> to be a band of clean sediments.  And then we have this high hit
> and basically the question that I had was that – where that came
> from.  So the 1922 aerial photograph solved that mystery for us.
> Please go to 1922 and please – okay.  Now, this is good.  This is a
> good scale, 5000.  As you can see this, this sample which we had
> located that before, way before that time, exactly coincide with the
> location of where Reilly's – their boats used to come.  This was the
> elusive Pier No. 1 which was used for transportation of creosote.
> In fact, we have a 1914 image, a picture, of the wife of one of
> Reilly's engineers who took a picture of his wife standing here
> with the boat here, and he talks about the 1,000-foot pipeline that
> they have for carrying creosote.  So the presence of this here now
> makes perfect sense.  That was the unloading area and there bound
> to be obviously some releases.  I just wanted to show you that.[18]

The thrust of this new opinion was that data collected in the 1989 report showed that

creosote had been detected in soil samples taken some 600 feet from the original shoreline and

therefore justified the hypothetical inclusion of that area as part of the site requiring remediation.

Dr. Rouhani concluded that the samples indicating the presence of creosote in that area made

"prefect sense".  Had counsel not addressed this issue, Rouhani would have made this opinion a

---

[17] Deposition of Shahrokh Rouhani, 11/20/09, pg. 199, Ex. 1.
[18] Deposition of Shahrokh Rouhani, 11/20/09, pg. 68, lines 2-23, Ex. 1.

center point of his testimony.  However, as the following colloquy makes clear, Dr. Rouhani had

misinterpreted the data:

Q:   What I'm asking is whether – is there any evidence in this report of any chemical analysis of the sample taken in A1?

A:   You're right.  It has not been chemically analyzed.  So that red corresponds to the smell of creosote which was visually described.

Q:   And the sample that showed the highest concentrations was Composite 1 – was 4278-1; was it not, sir?

A:   This is very interesting.  In this table when you look at it – keep going down – sample No. 1, you know, it was sample – yeah, clearly according to this is sample No. 1.  In the report it was cited a different way and that's the reason I want to go back and correct and comply with this because this appears to be the most definitive reality.  If you go to the earlier page of this document.  I think the source of confusion is this table which is RV-06728 and this Composite sample No. 2 was the one that ended up showing the highest number while in the table is the Composite 1, sample 1, which is showing the highest number.  I'm going to correct that and make it consistent, not with this table, but the laboratory sheet attached.

Q:   So I want to make sure that you and I are on the same page.  We agree that sample 4278-1 is the composite sample that has the highest concentration of PAH's that would be consistent with creosote, and that is a composite of A3 and B3; is that right?

A:   That's very right.

Q:   And show me where A3 then is, please, sir, on that?

A:   Sure.  And you see now the source of confusion.  But I agree with you that the laboratory results are the best ones, laboratory sheets, and A3 and B3 are located here.

Q:   Right.  And those are the closest to the shoreline, are they not?

A:   Yes.

Q:   **So when you testified earlier today that you found it very interesting that A1 – which was at the end of the Texaco pier, or the old railroad pier – had the highest concentration, that**

> **was actually erroneous testimony because that was not the correct sample; is that right?** (Emphasis added.)
>
> A:       **You're 100 percent right**.   In fact, this sample of the creosote smell was only indicated.[19]

This was not the only major error made by Rouhani that pertained directly to his opinions regarding contamination of the offshore area.   In his expert report, Section 4.1.35,[20] Rouhani claimed that the outfall of the former northern drainage ditch was immediately adjacent to the "Newly Discovered Creosote Area" and that the discharge point of the ditch was located <u>north</u> of the Texaco pier.   This conclusion allowed Rouhani to make a connection between materials flowing through the outfall to the area where creosote was allegedly found in 2006.   As usual, Rouhani had relied on work performed by someone else – the contractor who had done the RFI Phase I, and had interpreted the drawing incorrectly as the following makes clear:

> Q:       There had been some conversation earlier about this northern drainage ditch, and I'm a little confused.   If you would go back.   I know you put up an aerial photograph for us on that.   And perhaps just a misstatement in your report on page 26 of 92 under 4.1.35.   **As I read it, you're making the statement that the northern ditch discharges north of the Texaco pier**.   That's the last line.   **And that's not what I understood to be what you were showing on your photographs today?**
>
> A:       **Exactly**.
>
> Q:       So is that incorrect?
>
> A:       I'm very happy you raised that issue.   That was the correction – **the error that I made because by that time the only direct indication that I had about the northern drainage ditch were the work which was done on the RFI Phase I**.   In those graphs they were showing it to be north of the ditch – I'm sorry north of the Texaco pier.   Please go the GIS.   Move over there.   Deactivate this location.   Very good and deactivate – now go down and down to aerials.   I want you to putt 1922.   And go to the Scanned

---

[19] Deposition of Shahrokh Rouhani, 11/20/09, pg. 163, lines 19-23; page 164, lines 1-23; page 165, lines 1-15.
[20] Expert Report of Shahrokh Rouhani, 10/02/09, pg. 26.

Images and activate one of them that has the northern ditch which I believe this is from Phase I.  Thank you.

So, Ben, when we look at this diagram you see that this was in the RFI.  And the reason I like the Phase I because that was at least, you know, accurate later on.  Nobody really knew where – subsequent investigations were quite vague about the location. Here, as you can see, this "northern drainage ditch" – which by the way is from 1994 Phase I RFI site layout – shows that there is a ditch.  And this ditch when we look at it, there's a pier here.  The only pier that is shown is the Texaco one.  I assume that this is somewhere north of the ditch. Fortunately I got the 1922 aerial photograph.  Deactivate that and make it transparent so we can see it.  So no you look at it here.  The northern ditch was defined pretty nicely.  The problem was that when it was shown to be coming out here which, in fact, is between south of the Texaco pier and north of what used to be Pier No. 1 within this entrapped area.  And this was something I didn't know that until I got this 1922.  **So that was the reason that misstatement in the expert report**.[21] (Emphasis added.)

In order to maintain his position that the northern ditch was still the source of the alleged contamination despite the physical facts, Rouhani devised a new theory to account for the flow of the discharge upstream:

A:      So this is now a 1922 image.  This was pier No. 1.  Do you remember that, you know, historically that was out – by 1932 I believe it was dismantled.  This was Texaco pier.  An interestingly enough this area was blocked so no ship could go between these two piers which were only 146-feet apart according to the Port Report from 1922.  So now you see that this feature which was very much has characteristics of a ditch.  As you can see that the lighter color and shows the different type of surface texture which matches very well with what a ditch should have looked.  It would come here.  It would dump in stuff within this area which was stagnant because of the presence of these two piers.  And the more important thing is that this portion of the pier, or pier No. 1, in fact appears to be already covered by the shoreline material.  So these – it is very possible that there was a small eddy feature along the shoreline which would capture the material which was deposited and clearly the northern part of this area was still open, and that's

---

[21] Deposition of Shahrokh Rouhani, 11/20/09, pg. 185, lines 14-23; pg. 186, lines 1-23; pg. 187, lines 1-9, Ex. 1.

the reason that we see this gradual tendency towards the north.  So that' basically what I discovered.[22]

However, by the time he issued his rebuttal report in February 2010, Rouhani had once again changed his opinion – on page 19 of his report, section 8.3,[23] Rouhani presents a new and different theory to explain how this discharge moved north and upstream stating that "the bathymetry of the site shoreline as shown on figure 7 clearly indicates that the newly discovered creosote area is situated down-slope of the site historical pier and the outfall of the northern drainage ditch.  River bottom bathymetry in the vicinity of these potential site – related creosote discharge locations clearly explains the observed extent of the Newly Discovered Creosote Area." This discussion ends with a telling footnote - "During my deposition I noted that eddies could be a potential explanation of the observed geometry of the Newly Discovered Creosote Area.  However, after further considerations, I believe that the above bathymetric explanation is more reasonable."[24]

Clearly, the court cannot allow a witness to offer expert testimony that is ever – changing, caused by the expert's failure to perform the work about which he testifies, his consistent misconstruction of the data and repeated ventures far beyond his area of expertise. [25]

---

[22] *Id.* at pg. 128, line 23; pg. 129, lines 1-21, Ex. 1.
[23] February 2010 Expert Report of Shahrokh Rouhani, pg. 19, Ex. 3.
[24] *Id.* at n.33, Ex. 3.
[25] It is noteworthy that in instances where ignorance of a subject serves his purpose, Dr. Rouhani is quick to disclaim expertise.  When questioned about the likelihood that a significant source of contamination into the river was the historic use of a pier one for loading and unloading fuel oil, Dr. Rouhani stated:

> Q:    And I would like to tell me what activities you understand the Texas
>         Company to have conducted at its pier?
> A:    They were loading and unloading petroleum products.
> Q:    And how were they doing that?
> A:    By ship, I believe.
> Q:    And what were they using to do that with?
> A:    47, oil bunkering.  The only plant having facility for oil bunkering of large
>         vessel.  Can you focus on this one, please.  The only plant having facilities for
>         oil bunkering of large vessel is that of Texaco Company which has a pipeline to
>         Choctaw Point at the mouth of Mobile River.  And then it describes the

## LAW AND ARGUMENT

"The admission of expert evidence is governed by Federal Rule of Evidence 702, as explained by *Daubert* and its progeny." *Rink v. Cheminova, Inc.,* 400 F.3d 1286, 1291 (11th Cir. 2005) citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *see also Radcliff v. Tate & Lyle Sucralose, Inc.,* 2008 WL 5071900 (S.D. Ala.) (Court excluded expert testimony finding expert's methodology unreliable; expert's testimony based upon assumptions and speculation…rather than on principles and methods supported by reliable facts).   Federal Rule of Evidence 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise . . ." if certain criteria of reliability (as described in *Daubert*) and relevance are established.  Fed. R. Evid. 702. Thus, to be admissible, expert testimony must be helpful to the trier of fact, relevant to an issue in the case, and reliable.

In *Daubert,* the Supreme Court described the analytical framework for determining the admissibility of expert testimony under Rule 702.  There, the Court held that Rule 702 requires

---

|  |  |
|---|---|
|  | discharge pipeline are equipped with 4 and 6-inch connections and – with 6 and 8 hole flanges and have a bunkering capacity of 600 barrels per hour. |
| Q: | And were those activities conducted on the pier that you've been referring to as the Texaco pier? |
| A: | This is my understanding.  Let me clarify, I have no knowledge what these terms means, flanges and bunkering capacity, so on and so forth. |
| Q: | You don't know what a flange is? |
| A: | No. 6 and 8 hold flange, I don't. |
| Q: | And you're an engineer? |
| A: | Yes. |

Deposition of Shahrokh Rouhani, 11/20/09, pg. 176-177, Ex. 1.

courts to act as "gatekeepers" who must make a "preliminary assessment of whether the reasoning and methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." 509 U.S. at 592-93. "District courts are charged with this gatekeeping function 'to ensure that speculative, unreliable expert testimony does not reach the jury'". *Rink,* 400 F.3d at 1291 citing *McCorvey v. Baxter Healthcare Corp.,* 298 F.3d 1253, 1256 (11th Cir.2002). To fulfill their "gatekeeping" function under *Daubert,* district courts are required

> to engage in a rigorous inquiry to determine whether: '(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.'

*Id.* at 1291-92 quoting *City of Tuscaloosa v. Harcros Chems., Inc.,* 158 F.3d 548, 562 (11th Cir. 1998) (footnote omitted). The party seeking to introduce the expert testimony bears the burden of establishing its reliability by a preponderance of the evidence. *See Rink,* 400 F.3d at 1292 citing *Allison v. McGhan Medical Corp.,* 184 F.3d 1300, 1306 (11th Cir. 1999).

To be reliable, the testimony must relate to "scientific … knowledge, which implies that the testimony must be grounded in the methods and procedures of science and must be more than unsupported speculation or subjective belief." *Curtis v. M & S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999). An expert must "employ . . . in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). As the Fifth Circuit stated in *Moore,* "the party seeking to have the district court admit expert testimony must demonstrate that the expert's findings and conclusions are based on the scientific method, and therefore, are reliable." *Moore v. Ashland Chemical Co.,* 151 F.3d 269, 276 (5th Cir. 1998).

With respect to the "reliability" inquiry, Rule 702 provides that "a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  In *Daubert*, the court identified a non-exclusive list of factors to be considered in determining the reliability of an expert's proferred testimony, including: (1) whether the expert's methodology can be tested; (2) whether the expert's scientific technique and methodology has been subjected to peer review and publication; (3) whether the methodology and scientific technique has a known rate or potential rate of error and the existence and maintenance of standards controlling its operation; and (4) whether the technique and methodology is generally accepted in the scientific community.  509 U.S. at 593-95.  *See also Rink,* 400 F.3d at 1292 citing *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.,* 326 F.3d 1333, 1341, 1345 (11th Cir. 2003) (requiring expert testimony be based upon "sufficient data"). "Thus, the proponent of the testimony does not have the burden of proving that it is scientifically correct, but that by a preponderance of the evidence, it is reliable."  *Allison,* 184 F.3d at 1312; *see also Rink,* 400 F.3d at 1294 citing *Joiner,* 522 U.S. at 146 (within district court's discretion to consider the facts and data underlying expert testimony when an 'analytical gap [exists] between the data and the opinion proffered'").

After the party seeking to offer and introduce the expert testimony has demonstrated its helpfulness and reliability, it must then prove that the proferred testimony is relevant.  Relevance exists where there is "a valid . . . connection to the pertinent inquiry."  *Daubert,* 509 U.S. at 591-92. Under the relevance inquiry, "the court must 'ensure that the proposed expert testimony is 'relevant to the task at hand,' … i.e. that it logically advances a material aspect of the proposing

party's case." *Allison,* 184 F.3d at 1312 citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1315 (9th Cir. 1995) (on remand); *see also Boca Raton Comm. Hosp., Inc. v. Tenet Health Care Corp.,* 582 F.3d 1227, 1232 (11th Cir. 2009).  "Thus, the evidence must have a valid scientific connection to the disputed facts in the case."  *Allison,* 184 F.3d at 1312 citing *Daubert,* 509 U.S. at 591 (holding "scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes…Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility").  "[I]f an expert opinion does not have a 'valid scientific connection to the pertinent inquiry' it should be excluded because there is no 'fit'."  *Boca Raton,* 582 F.3d at 1232 quoting *Daubert,* 509 U.S. at 591-92.

Although a court evaluating an expert's testimony under *Daubert* "must focus 'solely on principles and methodology, not on the conclusions that they generate'"  "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Radcliff,* 2008 WL 5071900 at *2 quoting *Daubert,* 509 U.S. at 595 and *Joiner,* 522 U.S. at 146. It is within the court's discretion to conclude "that there is simply too great an analytical gap between the data and the opinion offered." *Radcliff,* 2008 WL 5071900 at *2 quoting *Joiner,* 522 U.S. at 146.

In the instant case, Dr. Rouhani's testimony does not pass *Daubert's* standard of reliability for two main reasons.  *Daubert*, 509 U.S. at 592.  First, Dr. Rouhani lacks the required expertise to offer regulatory and scientific opinions regarding alleged chemical contamination resulting from creosote operations, thus his opinions will not assist the trier of fact in this matter. Second, Dr. Rouhani's opinions are unreliable and often erroneous. Dr. Rouhani offers no opinions of his own but rather relies solely on the thoughts and conclusions of others taken out of

context.  Further, Dr. Rouhani's testimony is not based upon any scientific procedure or method as it consists of nothing more than factual narratives, legal conclusions, personal opinions, unsupported speculation and subjective belief.  Finally, Dr. Rouhani's opinions are unreliable in that he failed to investigate the subject property and failed to perform any scientific testing of the property.

Dr. Rouhani's testimony will not assist the trier of fact in understanding the evidence or determining a fact at issue because he "makes no effort to confine it to [his] areas of expertise" but rather routinely opines about subjects outside his area of expertise.  *Trasylol,* 2010 WL 1737107, at *17. Dr. Rouhani's testimony and opinions concerning CERCLA allocation and the National Contingency Plan (NCP) are outside his area of statistical expertise and thus should be excluded. Under Federal Rule of Evidence 702, an expert witness must be "qualified as an expert by knowledge, skill, experience, training or education" with regards to the topics of the proposed testimony.  "A scientist, however well-credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty.  That would not be responsible science." *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.,* 285 F.3d 609, 612-14 (7th Cir. 2002). Further, "a party cannot qualify as an expert generally by showing that the expert has specialized knowledge or training which would qualify him or her to opine on some other issue." *In re Diet Drugs Prods. Liab. Litig.,* MDL No. 1203, 2001 WL 454586, at *7 (E.D. Pa. Feb. 1, 2001).

Dr. Rouhani is a statistician; he is not a chemist,[26] scientist or an expert on federal environmental regulations.  In addition, Dr. Rouhani's testimony is devoid of any scientific analysis and consists of nothing more than a regurgitation of the facts with conclusions based upon those facts.  *See Trasylol,* 2010 WL 1737107 at *16.  "These facts should be presented to

---

[26] Deposition of Shahrokh Rouhani, Ph.D. in the matter entitled *MSOF Corporation, et al. v. Exxon Corporation, et al.*, page 117 at 19-23, Ex. 4.

the jury directly" for Dr. Rouhani's expertise, if any, "is not required to present the factual

narrative to the jury." *Id.* at *16, *17. *Daubert*'s standard of reliability for expert testimony was

enacted to exclude such pseudo-expertise offered by Dr. Rouhani.

     For all of the foregoing reasons, Dr. Rouhani's testimony should be excluded.


                              Respectfully submitted:

                              **LEMLE & KELLEHER, L.L.P.**

                              <u>s/ Benjamin R. Slater, III</u>
                              BENJAMIN R. SLATER, III (SLATB4389)
                              HAL C. WELCH (#13344)
                              LEMLE & KELLEHER, L.L.P.
                              601 Poydras Street, 21st Floor
                              New Orleans, LA 70130
                              Telephone:  (504) 586-1241
                              Facsimile:  (504) 584-9142
                              **ATTORNEYS FOR ILLINOIS**
                              **CENTRAL RAILROAD COMPANY**

<u>**CERTIFICATE OF SERVICE**</u>

     I hereby certify that on July 30, 2010, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system that will send notification of such filing to the following:


Walter M. Cook, Jr., Esq.
William E. Shreve, Jr., Esq.
LYONS, PIPE & COOK, P.C.
P.O. Box 2727
Mobile, Alabama 36652
wmc@lpclaw.com
wes@lpclaw.com

Richard E. Davis, Esq.
STARNES DAVIS FLORIE, LLP
100 Brookwood, 7th Floor
Birmingham, AL  35209
Birmingham, Alabama 35259-8512
rdavis@starneslaw.com
sdickens@starneslaw.com
avance@starneslaw.com
awhillock@starneslaw.com


William D. Little, Esq.
Attorney General's Office
11 S. Union Street
Montgomery, Alabama 36130
blittle@ago.state.al.us

lbooth@ago.state.al.us

This the 30th day of July, 2010.

s/  Benjamin R. Slater, III