UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT
OF ALABAMA SOUTHERN DIVISION

State of Alabama., *et al.*
v.
Alabama Wood Treating Corporation, *et al.*

Case No. 1:85-cv-0642-CG-C

# Environmental Review of Wood Treaters Site Mobile, Alabama

**Expert Report of**
**Shahrokh Rouhani, Ph.D., P.E.**
NewFields Companies, LLC
1349 West Peachtree St., Suite 2000
Atlanta, GA 30305
(srouhani@newfields.com)

October 2, 2009



EXHIBIT 2

reduction and/or elimination of discharge *"would have been a general resulting effect"* (Deposition of John Jones, p. 135-136). Railroad representative and former JTC member, Robert Strong, II, recently testified in his deposition as: *"Q: ...does the railroad know why the impoundment was constructed? A: It was our understanding it was constructed as a wastewater treatment measure in that facility. Q: As such it was to minimize discharges into the river and bay? A: That would be my understanding, yes."* (Deposition of Robert Strong p. 92)

4.1.32 Other Post-1974 improvements included the repair of the treatment room roof and gutter installation to decrease the amount of storm water flowing through the oil/water separator in January of 1975 (RV12373). AWTC also cleaned/reworked the ditch and shoreline as overseen by the US Coast Guard in response to a December 1, 1976 oil spill, which impacted the northern ditch (ASD17453; ASD13221).

**4.1.33 Newly Discovered Creosote Area**

4.1.34 The "Newly Discovered Creosote Area", situated within the reclaimed portion of the river, was accurately delineated in 2006. This area is primarily attributable to Site historic creosote releases via the northern drainage ditch prior to December 23, 1976.

4.1.35 The extent of the *"Newly Discovered Creosote Area"* was delineated based on a survey conducted in 2006 (ASD97788). The outfall of the former northern drainage ditch was immediately adjacent to the *"Newly Discovered Creosote Area"* (Figure: Newly Discovered Creosote Area). The February 1992 RFI Work Plan prepared under JTC supervision illustrates that *"the northern drainage ditch"* turns northward onto the Star/Texaco property before discharging north of the Texaco Pier (RV16427). The January 1993 NPDES/SID Permit Engineering Report prepared under JTC supervision illustrates the discharge point of the northern ditch as being north of the Texaco Pier. (RV16094). The report states that: *"One ditch runs along the northern boundary of the former process area and terminates at the Mobile River at existing NPDES outfall DSN 001. The geographical coordinates for this outfall are latitude 30°40'09" North and longitude 88°02'06" West"* (RV15999). The Phase I RFI prepared under JTC supervision illustrates that *"the northern drainage ditch"* turns northward onto the Star/Texaco property before discharging north of the Texaco Pier (RV17761).

4.1.36 The northern drainage ditch carried wastewater discharges from the Process Area and water from the barometric condenser (Reilly's direct contact cooling water system) prior to December 23, 1976. Ken Hagler recollects that in the early 1950s wastewater was going to the northern ditch (Deposition of Ken Hagler p. 53).

4.1.60 A November 17, 1977 AWIC inspection report confirmed the construction of a new discharge point for non-contact cooling water and described the wastewater holding facilities (*i.e.* the impoundments) as "*adequate*" (ASD17450).

4.1.61 NPDES Short Form C renewal signed by Joe Cocke December 27, 1978 indicated an average flow of 10,000-49,000 gallons of wastewater to the evaporation lagoon per day (ASD17448), which did not contain any contaminated contact cooling water <u>versus</u> 124,000 gallons of combined wastewater and contaminated direct contact cooling water to the river as reported in the 1971 RAPP application (RV12628).

4.1.62 On November 10, 1979 John Ball submitted an engineering report detailing plans to improve functioning of the impoundments and indicated that AWTC had removed an abandoned municipal water line, which had been contributing water to the impoundments (RV12471-RV12479).

4.1.63 On February 26, 1980 AWTC's NPDES permit was renewed. The permit was for non-contact cooling water and did not mandate monitoring of phenols (RV12460). According to the permit, "*no process waste is to be discharged from this facility.*" The elimination of phenols monitoring requirement indicates AWIC's confidence in the performance of the non-contact cooling system.

4.1.64 By May 8, 1980 the evaporative spray system was installed in the impoundments according to CM Rou's letter to AWIC. (RV12456)

4.1.65 AWTC's NPDES permit was renewed June 9, 1981. The permit was for non-contact cooling water and did not mandate monitoring of phenols (ASD04767). According to the permit, "*there shall be no discharge of process wastewater.*" According to the permit, "*there shall be no discharge of...stormwater containing process related substances.*" The continued exclusion of phenols monitoring requirements further indicates AWIC's confidence in the performance of the Site's non-contact cooling system.

4.1.66 John Ball reported to AWIC on July 28, 1981 that the boiler blow-down line had been rerouted to the wastewater evaporation system and no longer had a direct discharge. Additionally, a change in the operating procedure had been made to increase the length of the final vacuum to decrease drippage from treated wood (RV12642).

## 4.2 Opinion 2. Site remedy is reasonable and has been implemented not inconsistent with NCP.

4.2.1 Opinion 2 is supported by the following series of facts and observation.

**4.2.2 Site Main Remedial Components**

4.2.3 My technical review indicated that the main Site remedial components included closure of RCRA impoundments, focused removals/surface cap, DNAPL recovery, and long-term groundwater monitoring.

4.2.4 Due to the fact that the closure of RCRA impoundments was completed under JTC supervision, my review focused on other remedial components at the Site.

**4.2.5 Focused Removals/Surface Cap**

4.2.6 The soil remedy at the Site consisted of focused removal prior to the installation of surface caps. The focused removal of contaminated media included those associated with SWMU 5 pipeline remediation, SWMU 6 soil source removal and Monitoring Well Cluster No. 7 Area remediation. The surface cap covers both the former on- and off-shore parts of the Site.

4.2.7 The surface cap covering the on-shore part of the Site addresses soil and sediment areas impacted primarily by releases of creosote and coal tar distillate compounds as well as pentachlorophenol.

4.2.8 The surface cap covering the former off-shore part of the Site addresses the remaining off-shore contamination caused by historical Site releases of creosote and coal tar distillate compounds.

4.2.9 The former offshore part of the Site contains the river and sediment area adjacent to the Reilly/AWTC facility. This former offshore area is part of the regulatory boundary of the Site. The necessity to address offshore contamination was repeatedly highlighted by ADEM representative Stephen Cobb: "...*the corrective action requirement is for all property, contiguous property, under the ownership and/or operational control of the entity*" (Deposition of Stephen Cobb, VOL I, p. 70); "*you follow the contamination where it goes*" (Deposition of Stephen Cobb, VOL I, p.90); "*in evaluating the extent of the plume, you go where the plume goes*" (Deposition of Stephen Cobb, VOL II, p.91).

4.2.10 The discovery of "*Newly Discovered Creosote Area*" within the reclaimed river bottom area necessitated a remedial action within the former offshore part of the Site. The implemented interim remedy in May 2006 addressed the free products and contaminated water accumulated within an exposed area of river bottom. The surface cap is a robust remedy for addressing the remaining creosote in the river sediment.

4.2.11 The surface cap of the former offshore part of the Site, buttressed by bulkhead sheetpiles, provides far superior long-term protection against (a) scouring of creosote laced sediments, (b) offsite migration of creosote, (c) exposure to creosote laced sediments, and (d) erosion of the surface cap than the originally considered

riprap shoreline stabilization. In fact, ADEM staff testified when questioned, "*Q: ...the reclamation of that area that had been previously beneath the water, that 200 feet, as well as the construction of that wharf which incorporated that sheet pile wall as part of it, those were not part of the remediation; those were part of the project, the terminal construction project; is that right? A: It was both. One, the basic purpose of it was the Port facility, but it also served as a far better -- I say far better -- it achieved the goal of the shoreline protection too*" (Deposition of Tom Birks, p. 23).

### 4.2.12 DNAPL Recovery

4.2.13 DNAPL recovery is solely driven by historical Site coal tar distillates/creosote releases. DNAPL recovery is a required component of the Site remedy whose importance to the Site remediation was recognized by the JTC. The JTC recognized the importance of DNAPL recovery to remediation at the Site in the 1990 Corrective Action Plan, which stated: "*Although data from the AWTC site suggests the presence of very small quantities of light petroleum products, a larger, and potentially recoverable volume of non aqueous phase liquid (NAPL) apparently exists at various depths in the upper and lower water-bearing zones. Properly designed recovery wells may be used to recover much of the free product*" (ADEM015718).

4.2.14 The DNAPL system proposed and installed by the JTC was designed to address DNAPLs, *not* LNAPLs. LNAPLs are often associated with petroleum releases. DNAPL source removal was the driving force behind the free-phase extraction system. Any LNAPL present at the Site changed neither the extent nor the scope of the DNAPL recovery system. As recognized by the JTC in 1990, "*Since this site appears to contain only dense NAPLs, specifically creosote, this discussion will focus on the recovery of these NAPLs*" (ADEM015719).

4.2.15 The subsequent expansion of DNAPL recovery was required by the 1998 Consent Order. As stated: "*That immediately upon execution of this Consent Order, the ASPA shall expand the ongoing DNAPL corrective action program to include all wells that contain measurable and recoverable DNAPL*" (ADEM002293).

4.2.16 Ongoing DNAPL monitoring and recovery of free product was a requirement of the 2003 Hazardous Waste Facility Permit. As stated: "*ASPA has completed a portion of the corrective action by removing contaminated media and initiating removal of Dense Non-Aqueous Phase Liquid (DNAPL) from subsurface soil and groundwater. Operation of the DNAPL removal system continues